## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF RHODE ISLAND

In re:                                                    Chapter     7
                                                          Case No.   11-11077
JASON A. WEBSTER
& PAULA C. WEBSTER

                Debtors

WILLIAM K. HARRINGTON                                     Adversary Proceeding
                                                          No. 11-01085
                Plaintiff

v.

JASON A. WEBSTER
& PAULA C. WEBSTER

                Defendants

## DECISION

The crux of this action in which the United States Trustee ("UST") seeks the revocation of the discharge granted to debtors Paula and Jason Webster is: "When is the truth the truth?" The UST commenced this adversary proceeding on October 31, 2011, contending that the Websters intentionally failed to disclose to the Chapter 7 Trustee that Mr. Webster was the unfortunate victim of *two* separate accidents and that he was pursuing *three* pre-petition personal injury-related claims arising out of those accidents.

I am troubled by this proceeding because I empathize with the Websters. They are hardworking, decent individuals who found themselves in financial and emotional distress as a result of Mr. Webster's injuries, which ultimately prevented Mr. Webster from being gainfully

1

employed despite his best efforts to continue to work and support his family. Nonetheless, the answer to the question posed above is quite straight forward, and one the Websters, like the rest of us, learn early in life—*the truth is the truth always*.

After carefully considering all of the evidence before me, including the testimony of the Websters and the other witnesses at the trial in this proceeding conducted on November 14 and 15, 2012, I find that debtors Paula and Jason Webster exhibited a reckless indifference to the truth throughout their bankruptcy case. The Chapter 7 Trustee relied on the false statements made by the Websters at the meeting of creditors held pursuant to Bankruptcy Code § 341[1] and did not discover these personal injury claims being pursued by non-bankruptcy counsel until after the entry of the Websters' discharge. Perhaps the Websters succumbed to the anguish they suffered as a result of Mr. Webster's serious injuries sustained in these accidents. The Bankruptcy Code, however, is quite clear regarding the sanctions for such false and intentionally misleading statements. The discharge granted to the Websters must be revoked pursuant to § 727(d).

### BACKGROUND AND STIPULATED FACTS

Mr. and Mrs. Webster filed their joint petition under Chapter 7 of the Bankruptcy Code on March 21, 2011.[2] Following the § 341 meeting of creditors held by the Chapter 7 Trustee, Charles Pisaturo, the Websters were granted their discharge on June 28, 2011. (Doc. #34). Approximately four years prior to the bankruptcy filing, on January 26, 2007, Mr. Webster was injured on the job while making a delivery to a Shaw's Supermarket. (JPT I. at ¶ 1). Mr. Webster

---

[1] 11 U.S.C. § 101, *et. seq.* Hereinafter, unless otherwise indicated, all references to statutory provisions are to the applicable sections of the Bankruptcy Code.

[2] The parties submitted stipulated facts in their Joint Pre-Trial Order ("JPT"). (AP Doc. #25).

retained Attorney Gregory Boyer to represent him in connection with these injuries. (JPT I. at ¶ 1). On September 30, 2009, one day after rejecting a settlement offer of $65,000, Attorney Boyer, on behalf of Mr. Webster, withdrew Mr. Webster's settlement offer of $350,000 and commenced a civil action against Shaw's Supermarkets, Inc. and Schwan's Consumer Brands North America, Inc. before the Rhode Island, Providence County Superior Court. (JPT I. at ¶¶ 2, 3) (the "Personal Injury Claim").

Ill fate again visited the Websters when on November 12, 2010, approximately four months before the bankruptcy petition filing, Mr. Webster was struck by a car during the course of his employment and suffered additional serious injuries. (JPT I. at ¶ 6).  Mr. Webster engaged Attorney Boyer to pursue a worker's compensation claim (the "Worker's Compensation Claim") and an uninsured motorist claim (the "Uninsured Motorist Claim") on his behalf. (JPT I. at ¶¶ 6, 7). The parties do not dispute that Mr. Webster's interests in the Personal Injury Claim, the Worker's Compensation Claim and the Uninsured Motorist Claim (collectively the "Pre-Petition Claims") were property of his bankruptcy estate pursuant to § 541(a). (JPT I. at ¶¶ 9-11).  The parties also agree that "the United States Trustee and the Chapter 7 [T]rustee were unaware of the existence of the [Pre-Petition Claims] until after the entry of the discharge" granted to the Websters pursuant to § 727(a). (JPT I. at ¶ 15).

On October 31, 2011, after the Chapter 7 Trustee learned of the existence of the Pre-Petition Claims, the UST filed this adversary proceeding seeking revocation of the Debtors' discharge pursuant to §§ 727(d)(1) and 727(d)(2). (AP Doc. #1).

## JURISDICTION

The Court has jurisdiction over this proceeding under 28 U.S.C. §1334(b) and 28 U.S.C.

§ 157(a). This is a core proceeding under 28 U.S.C. § 157(b)(2)(J).[3]

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

The following are my additional final findings of fact to which the parties have not

stipulated and my conclusions of law.

Mr. Webster testified that although he continued to work after his first accident in which

he sustained a substantial wrist injury, he reached a point where he was unable to satisfy the

physical demands of his job due to the injury. (Trial Transcript, Day 2, at p. 30) [hereinafter

"Trial Tr."]. Mr. Webster found new employment that did not involve heavy lifting, but annually

he earned less than half of the earnings he had formerly received. (Trial Tr. Day 2, at pp. 30-31).

With the decreased salary, the Websters struggled to make ends meet. They reached out to a debt

consolidation program through the Fairhaven Law Group ("Law Group") to which the Websters

paid "roughly a little over $700" a month into a fund held by the Law Group. In turn the Law

Group distributed the funds to the Websters' creditors once sufficient funds had accumulated in

their account. (Trial Tr. Day 1, at p. 164). The Law Group deducted a fee of approximately $300

per month from the Websters' monthly payment. (Trial Tr. Day 1, at p. 164; Trial Tr. Day 2, at p.

32). When the Websters found it overly burdensome to continue making their monthly

contributions to the fund, the Law Group suggested that the Websters consider filing for

---

[3] *See In re Michal*, 2008 WL 7866894, at *2 (Bankr. N.D. Ga. Mar. 4, 2008) ("The revocation of a discharge, which
is a form of objection to a discharge, is plainly a core proceeding.").

4

bankruptcy. The Law Group referred the Websters to Rhode Island attorney Augustus Charos.[4] (Trial Tr. Day 1, at pp. 165-66; Trial Tr. Day 2, at p. 32).

Attorney Charos contacted the Websters and held an initial meeting in June 2010, but did not complete the paperwork necessary to commence a bankruptcy filing at that time. (*See* Trial Tr. Day 2, at p. 39). In August 2010, the Websters received a letter from a creditor informing them of a potential wage garnishment, which prompted the Websters to return to Attorney Charos's office in September 2010. (Trial Tr. Day 1, at p. 168-69; Trial Tr. Day 2, at pp. 39-41). They also paid Attorney Charos his requested fee of $1,800 to complete the bankruptcy process. (Trial Tr. Day 1, at p. 169; Trial Exhibit 5). Following the September meeting, the Websters completed a "bankruptcy questionnaire" provided by Attorney Charos in which they listed their personal and financial information. (Trial Tr. Day 1, at pp. 169-70). In the expense section of the questionnaire, the Websters included a $500 monthly expense noted as "parents loan" under the "other" category of the monthly household expenses in that section. (Trial Exhibit 1, at p. 50). A notation of "N/A" was made in the section of the questionnaire entitled "Other Property" the section entitled "Other Debts Owed to You" was left blank. (Trial Exhibit 1, at pp. 40, 42). The bankruptcy schedules Attorney Charos prepared and filed with the Court did not include Mr. Webster's Pre-Petition Claims, nor was the existence of the pending Providence County Superior Court civil action listed on page 4 of their Statement of Financial Affairs. (Trial Exhibits B and C).[5]

---

[4] Attorney Charos was called as an adverse witness at the trial on behalf of the Websters.

[5] The Websters did not amend their bankruptcy schedules or Statement of Financial Affairs to disclose the Pre-Petition Claims until June 12, 2012, approximately eight months after this adversary proceeding had been commenced. (Trial Exhibit L).

Mr. Webster testified that he informed Attorney Charos of the Pre-Petition Claims. (Trial Tr. Day 2, at pp. 35-49). Mr. Webster also testified that he informed Attorney Charos that there were no pending settlement offers and that he had not received any funds from these claims. (Trial Tr. Day 2, at p. 37). Additionally, Mrs. Webster testified that Attorney Charos emphasized to the Websters during the September 2010 meeting that with no written offer, there was no claim. (Trial Tr. Day 1, at p. 180). Attorney Charos, in his trial testimony, did not rebut the Websters' statements.[6]

Despite this unrebutted testimony, I find that Mr. Webster was not forthcoming with Attorney Charos about the Pre-Petition Claims. Mr. Webster admitted at trial that he did not provide Attorney Charos with extensive detail about these claims because his personal injury attorney was already handling the claims:

Mr. Webster:    He -- my wife had mentioned that I had the injury, and he had basically asked me, you know, what had happened, and I told him what I just told the Court of how it -- how it went down, how it happened, and he just asked me if, you know, are you -- are you represented? And I said yes. I said I do have a lawyer. And he goes, you know -- I said, it's Gregory Boyer. And he said, oh, I do personal injury, too. I was just asking. You know, I -- I'm not trying to take you away from him. And I said, no. I have a long term personal injury lawyer that I trust.

---

[6] Subsequent to the trial but prior to the rendering of this decision, the UST filed a motion seeking civil fines, disgorgement of fees, injunctive relief and suspension of Attorney Charos's CM/ECF privileges. (Bankr. Doc. #98). Included in the facts portion of the UST's motion was the allegation that "Attorney Charos failed to adequately advise the Debtors about their obligation to disclose the pre-petition personal injury claims of Jason Webster in their Bankruptcy Schedules and Statement of Financial Affairs." ( *Id.*, pp.1-2 at ¶ 4) The UST also asserted that "Attorney Charos prepared Bankruptcy Schedules and Statement of Financial Affairs for filing with this Court that he either knew or should have known were materially inaccurate because these documents failed to disclose the existence of Jason Webster's personal injury claims." (*Id.*, p. 2 at ¶ 5). In response to this motion, Attorney Charos agreed to a consent order with the UST wherein Attorney Charos "acknowledges that sufficient facts exist for the granting of the Motion and that he has voluntarily entered into this Consent Order." (Bankr. Doc. #99).

. . .

| | |
|---|---|
| Mr. Donahue[7]: | Did he ask you whether there were any offers pending at that time? |
| Mr. Webster: | Mr. Charos just basically asked me if -- if I had received any money, or is there any -- anything on the table? Is there anything in front of you? You know, do you have any – any type of money indicated with this case? And I said, what do you mean, like an -- you know, like -- did they settle? And I said, no, there's no settlement. There was no -- I haven't received any paperwork that was saying that there was an offer. |

(Trial Tr. Day 2, at pp. 36-37). Notably, Attorney Charos testified that he had no knowledge that Mr. Webster, through Attorney Boyer, had proffered a $350,000 settlement offer with regard to the Personal Injury Claim, or that after full discussion with Attorney Boyer, Mr. Webster authorized the rejection of a $65,000 offer tendered to Mr. Webster in September of 2009 and to withdraw his initial $350,000 settlement offer. (Trial. Tr. Day 2, at p. 18). Mr. Webster also authorized Attorney Boyer to commence suit on his behalf to pursue the Personal Injury Claim. (Trial Tr. Day 2, at pp. 18-19). Mr. Webster neither refuted this testimony, nor did he testify that he had communicated such settlement offer to Attorney Charos. (*See* Trial Tr. Day 2, at p. 37).

Additionally, the schedules filed by the Websters were deficient in other respects. Schedule F omitted Mrs. Webster's parents as creditors of the couple. (Bankr. Doc. #3). While taking advantage of a $500 monthly expense item described as "loan parents" on Schedule J (Trial Exhibit C), Mrs. Webster admitted that she intentionally omitted her parents from Schedule F because she did not want them to know that she and her husband filed for

---

[7] Mr. Donahue, an attorney in the Rhode Island office of the United States Trustee, Region One, represented the UST in this proceeding.

7

bankruptcy. (Trial Tr. Day 1, at p. 140).  Furthermore, despite Mr. Webster testifying that he was

not "in the habit of signing blank documents" (Trial Tr. Day 1, at p. 96), and Mrs. Webster, who

is a bank loan officer, testifying that she does not allow customers to submit loan documents in

blank, (Trial Tr. Day 1, at p. 149), Mrs. Webster conceded that the she signed the Declaration

Concerning Debtor's Schedules in blank (Trial Tr. Day 1, at pp. 147-48). It appears that Mr.

Webster also signed the Declaration page in blank. (Trial Tr. Day 1, at pp. 96, 105-09). The

Websters signed their bankruptcy schedules in blank while "declaring under penalty of perjury

that [they had] read the foregoing summary and schedules consisting of 17 sheets and that they

are true and accurate to the best of [their] knowledge, information, and belief." (Trial Tr. Day 1,

at pp. 96, 105-09, 147-48).

Of critical importance to this proceeding is what occurred during the § 341 meeting of

creditors held on April 28, 2011. Mrs. Webster testified that upon entering the meeting room, she

noticed a plaque on the wall reminding debtors that their statements were being made under the

pains and penalties of perjury. (Trial Tr. Day 1, at p. 160). She then pointed out this sign to her

husband and asked Attorney Charos about the Pre-Petition Claims:

| | |
|---|---|
| Mr. Donahue: | Did he tell you there were no injuries? |
| Mrs. Webster: | When -- briefly when we came in, when I did see the plaque on the wall, he came -- I said something to him, he talked to Jay, and when we -- we asked him again that same question about the lawsuit, he walked away with disgust and just said it's no, there's no written offers, and just left us there. |

(Trial Tr. Day 1, at p. 160; Trial Tr. Day 2, at p. 50). In his self-serving testimony, Attorney

Charos denied that such conversation occurred. (Trial Tr. Day 2, at pp. 21-22).

During the § 341 meeting, Trustee Pisaturo, an experienced chapter 7 trustee, asked the

Websters a set of standard but very specific questions relating to potential assets and claims:

| Trustee Pisaturo: | Do you have any other assets? |
|---|---|
| Paula Webster: | No. |
| Trustee Pisaturo: | No? |
| Jason Webster: | No, sorry. |
| Trustee Pisaturo: | Any other property at all? |
| Jason Webster: | No, sir. |
| Paula Webster: | No. |
| Trustee Pisaturo: | Anybody owe you any money? |
| Both [Debtors] Speak: | No. |
| **Trustee Pisaturo:** | **Claims against anybody?** |
| **Both [Debtors] Speak:** | **No.** |
| **Trustee Pisaturo:** | **Injuries?** |
| **Both [Debtors] Speak:** | **No.** |
| **Trustee Pisaturo:** | **Auto accidents?** |
| **Both [Debtors] Speak:** | **No.** |
| **Trustee Pisaturo:** | **Settlements?** |
| **Both [Debtors] Speak:** | **No.** |

(Trial Exhibit F, § 341 Meeting, April 28, 2011 Transcript, at pp. 11-12) (emphasis added).[8] In

reliance upon the Websters' responses and his review of their bankruptcy schedules and

---

[8] The parties agree that the date of April 24, 2011 listed on the transcript of the § 341 meeting is incorrect and that
the meeting occurred on April 28, 2011.

Statement of Financial Affairs, Trustee Pisaturo did not object to the Webster's discharge. The

Court entered an order discharging the Websters on June 28, 2011. (Bankr. Doc. #34). It was not

until after the Websters received their discharge that Trustee Pisaturo learned of Mr. Webster's

pending Personal Injury Claim from counsel for one of the defendants in the Providence County

Superior Court action, (JPT I. at ¶¶ 15-16), motivating the UST to file this adversary

proceeding.[9]

### POSITION OF THE PARTIES

The UST seeks revocation of the Websters' discharge pursuant to § 727(d)(1) on the

grounds that the Websters, by falsely answering the Chapter 7 Trustee's questions during the

creditors' meeting regarding Mr. Webster's injuries and claims, obtained their discharge by

fraud, which was not discovered by the Chapter 7 Trustee until after the discharge entered. The

UST emphasizes that at the § 341 meeting debtors are provided the opportunity to correct

misstatements contained on their bankruptcy schedules and Statement of Financial Affairs and

disclose any assets omitted from the same. The UST has also moved to revoke the Webster's

discharge pursuant to § 727(d)(2) on the grounds that the Websters acquired property of the

estate or became entitled to acquire property that would be property of the estate, and

fraudulently failed to report or surrender such property to the Chapter 7 Trustee. The Websters,

in response, assert that their answers at the § 341 meeting were made in reliance upon the advice

---

[9] After investigating the Worker's Compensation Claim and the Uninsured Motorist Claim, Trustee Pisaturo filed a
Notice of Abandonment of Assets (Bankr. Doc. #91), to which no objection was filed. Mr. Webster's Personal
Injury Claim was ultimately settled by Trustee Pisaturo for $115,000, which sum was sufficient to pay in full Mr.
Webster's creditors who actually filed claims. (Bankr. Doc. #51). Creditors who filed claims only against Mrs.
Webster have not been paid. (Trial Tr. Day 1, at p. 53).

of counsel and that they believed their answers to be true when uttered. Therefore, the Websters

contend that they acted without fraudulent intent.

## DISCUSSION

Bankruptcy Code §§ 727(d)(1) and 727(d)(2) provide two grounds for revocation of a

debtor's discharge:

> On request of the trustee, a creditor, or the United States Trustee, and after
> notice and a hearing, the court shall revoke a discharge granted under subsection
> (a) of this section if-
>
> (1) such discharge was obtained through the fraud of the debtor, and the
> requesting party did not know of such fraud until after the granting of such
> discharge;
>
> (2) the debtor acquired property that is property of the estate, or became entitled
> to acquire property that would be property of the estate, and knowingly and
> fraudulently failed to report the acquisition of or entitlement to such property, or
> to deliver or surrender such property to the trustee.

The "principal purpose of the Bankruptcy Code is to grant a fresh start to the honest but

unfortunate debtor." *Marrama v. Citizens Bank of Mass.*, 548 U.S. 365, 367 (2007). "[B]ecause

revoking a discharge is an extraordinary remedy, § 727(d) should be construed liberally in favor

of the debtor and strictly against those objecting to discharge," and the party moving for

revocation bears the burden of proving, as to each debtor,[10] the elements under § 727(d)(1) or

§ 727(d)(2) by a preponderance of the evidence. *In re Gillis*, 403 B.R. 137, 144 (B.A.P. 1st Cir.

2009).

---

[10] "Though husband and wife may file a joint bankruptcy petition, commencing one case, their joint filing
nonetheless creates two estates that remain separate except to the extent that the court determines to consolidate
them." *In re Fanaras*, 263 B.R. 655, 664 n.12 (Bankr. D. Mass. 2001). *See also* Bankruptcy Code § 302.

When bringing an action under § 727(d)(1), the trustee, a creditor, or the United States Trustee must seek revocation within one year of the date the discharge entered. § 727(e)(1). With respect to revocation of a discharge sought under § 727(d)(2), the action must be brought within one year after the date the discharge entered or the date the case is closed, whichever is the later date. § 727(e)(2). The Websters' discharge entered on June 28, 2011. (Bankr. Doc. #34) and the UST filed the adversary proceeding on October 31, 2011 (AP Doc. #1). This four-month span between the Court's entry of discharge and the UST's filing of the adversary proceeding is well within the time limits of §§ 727(e)(1) and 727(e)(2).

## A. Revocation of Discharge under § 727(d)(1)

The first basis under which the UST seeks revocation of the Websters' discharge is Bankruptcy Code § 727(d)(1). The First Circuit Bankruptcy Appellate Panel has outlined the following elements to be considered in a § 727(d)(1) action:

> (1) the debtor obtained the discharge through the fraud; (2) the [party moving for revocation] possessed no knowledge of the debtor's fraud prior to the granting of the discharge;[11] and (3) the fraud, if known, would have resulted in denial of discharge under § 727(a).

*See In re Gillis*, 403 B.R. at 144.

As a threshold matter, the second element noted above has been established by the UST through the parties' stipulation that Trustee Pisaturo was not aware of Mr. Webster's Pre-Petition Claims until after the entry of the Websters' discharge. (JPT I. at ¶ 15) And, because the

---

[11] Some courts make an exception where the party moving for revocation obtained knowledge of the fraud after the deadline for objections to discharge but before the entry of discharge, making compliance "literally impossible." 6 COLLIER ON BANKRUPTCY ¶ 727.17[3] (16th ed. rev. 2010). *See, e.g., Citibank, N.A. v. Emery (In re Emery)*, 132 F.3d 892, 896 (2d Cir. 1998) ("A rule barring a creditor for failing to seek an extension of the bar date in those circumstances would pressure creditors to move for precautionary extensions of the bar date based on the slightest suspicion and thus interfere with the Bankruptcy Code policy in favor of a prompt discharge for deserving debtors.").

12

Websters falsely answered his question about any injuries they may have sustained, Trustee Pisaturo was certainly not aware of Mr. Webster's substantial injuries resulting from the 2007 and 2010 accidents. (Trial Tr. Day 1, at p. 31).

As for the first element set forth in *In re Gillis*, the UST must demonstrate that "actual fraud" involving an intentional wrong, "such as the intentional omission of assets from the debtor's schedules" was committed by the debtor. 6 COLLIER ON BANKRUPTCY ¶ 727.17[2] (16th ed. rev. 2010). "Nondisclosure of prepetition property is 'the classic example of obtaining a discharge by fraud." *In re Marcella*, 2009 WL 3348251, at *14 (Bankr. D. Mass. Oct. 15, 2009) (quoting *Still v. Gault (In re Gault)*, 2006 WL 2270338, at *3 (Bankr. E.D. Tenn. Aug. 4, 2006)) (noting grounds for revocation under § 727(d)(1)).

The third element cited in *In re Gillis* incorporates a standard of actual fraud, such that a court would have denied a debtor's discharge under § 727(a). *See In re Barr*, 207 B.R. 160, 165 (Bankr. N.D. Ill. 1997) ("The court can revoke a discharge only if the debtor would not have been discharged pursuant to § 727(a), absent newly discovered evidence."). "In this way, the third element subsumes the first to the extent that an analysis of the third element, which in this case is under 11 U.S.C. § 724(a)(4), inherently requires the same analysis of whether the debtor committed the fraud in fact." *In re Larson*, 2010 WL 1633466, at *4 (Bankr. D. Mass. Apr. 20, 2010). Section 724(a)(4)(A) is applicable in the instant proceeding before this Court. This provision provides: "[t]he court shall grant the debtor a discharge, unless—… (4) the debtor knowingly and fraudulently, in or in connection with the case—(A) made a false oath or account." Under this provision, "the debtor can be refused his discharge only if he (i) knowingly

13

and fraudulently made a false oath, (ii) relating to a material fact." *Boroff v. Tully (In re Tully)*, 818 F.2d 106, 110 (1st Cir. 1987).

While the denial of discharge provisions, including § 727(a)(4), must be construed liberally in favor of a debtor in the same way as the revocation of discharge provisions, the overriding principle remains that the bankruptcy system is intended for the "honest but unfortunate debtor." *In re Scheffer*, 450 B.R. 271, 274-75 (Bankr. D. Mass. 2011) (citing *Marrama*, 548 U.S. at 367).

The Court of Appeals for the First Circuit further explained the impact of § 727(a)(4)(A) on the issue of a debtor's discharge:

> [T]he very purpose of certain sections of the law, like 11 U.S.C. § 727(a)(4)(A), is to make certain that those who seek the shelter of the bankruptcy code do not play fast and loose with their assets or with the reality of their affairs. The statutes are designed to insure that complete, truthful, and reliable information is put forward at the outset of the proceedings, so that decisions can be made by the parties in interest based on fact rather than fiction. As we have stated, "[t]he successful functioning of the bankruptcy act hinges both upon the bankrupt's veracity and his willingness to make a full disclosure." Neither the trustee nor the creditors should be required to engage in a laborious tug-of-war to drag the simple truth into the glare of daylight.
>
> . . .
>
> Sworn statements filed in any court must be regarded as serious business. In bankruptcy administration, the system will collapse if debtors are not forthcoming.

*In re Tully*, 818 F.2d at 110-12 (internal citations omitted).

Section 727(a)(4)(A) ensures that false, fraudulent statements by a debtor are not made without significant consequences. "Allegations of lying in the filed Schedules and Statement of Affairs, *and the 341 Meeting* . . . satisfy the requirement of alleging a post-petition fraud." *Richardson v. McCullough (In re McCullough)*, 259 B.R. 509, 522 (Bankr. D.R.I. 2001)

(emphasis added) (ordering that the debtor's discharge be revoked under § 727(d)(1) because the debtor testified at the § 341 meeting, "that he had not received any monies from the Trust" when the debtor had actually received significant funds from the Trust four days prior to the meeting and additional funds on the same day as the meeting). Moreover, for purposes of fraud under § 727(a)(4)(A), "reckless indifference to the truth has consistently been treated as the functional equivalent of fraud." *In re Tully*, 818 F.2d at 112.

The Websters began their descent on the slippery slope from candor and full disclosure to a reckless indifference to the truth with their bankruptcy schedules and Statement of Financial Affairs and continuing through the § 341 meeting of creditors. I conclude that they made several material false statements under oath, including the omission of the Pre-Petition Claims and the state court action to pursue the Personal Injury Claim from these filings as well as the deliberate omission of Mrs. Webster's parents as creditors on Schedule F. Although the false statements in their bankruptcy schedules and Statement of Financial Affairs are factors in my decision, of pivotal importance to my findings and conclusions are the false statements the Websters intentionally made during the § 341 meeting that misled the Chapter 7 Trustee and obstructed his efforts to timely discover assets of Mr. Webster's bankruptcy estate.[12]

When asked by Mr. Pisaturo at the § 341 meeting whether they had any claims, Mr. and Mrs. Webster each answered "no." They also unequivocally answered "no" in response to further detailed questioning by Trustee Pisaturo regarding whether they had any injures, auto accidents or settlements. (Trial Exhibit F, at pp. 11-12). At this meeting debtors are given a second chance

---

[12] Counsel for the UST emphasized that the conduct of the Websters at the § 341 meeting is the key to his action, remarking in his closing statement at trial that "if it were just based on the schedules, Judge, if that were the only basis, and that there were mistakes in the schedules, and there was reliance on counsel on that, we wouldn't be here today." (Trial Tr. Day 2, at p. 64).

to candidly disclose their assets and tell the truth about their financial affairs if their schedules do not accurately reflect their assets and financial transactions. Despite this opportunity, the Websters simply did not tell the truth. They did not disclose the Pre-Petition Claims to Trustee Pisaturo notwithstanding their misgivings about the advice of their bankruptcy counsel and the clear and probing questions of the Chapter 7 Trustee regarding personal injuries and personal injury claims. The Websters' answers were clearly false, and I conclude that the Websters knew their answers were not true when uttered. The Websters' protestations that they relied on the advice of their bankruptcy counsel and thought their answers were true at the time they were made are unreasonable and implausible. (Trial Tr. Day 1, at pp. 112, 119, 154, 158).

The record is replete with evidence of just how debilitating Mr. Webster's injuries were and the devastating impact they had on his quality of life and the family finances. For example, in answering interrogatories propounded by Shaw's Supermarkets, Inc. in the Providence Superior Court action, Mr. Webster explained:

> I have severe problems with my right wrist and hand, and I am now developing additional problems with my left hand, wrist, and elbow due to compensating for the right extremity injury…I am told that fusion will alleviate much of the pain, but I will lose the majority of function in my wrist once it is fused. I am continuing to work in a reduced capacity, and, in fact, changed jobs in April of 2007 after my injury because I could no longer do the strenuous activities associated with that job. I am constantly in pain, I have weakness and throbbing in my right wrist, arm, and hand. This injury has completely affected my life as I am no longer able to engage in the level of physical activity I engaged in previously… The injury has affected my family life at home, as I am now much more irritable and quick to anger, and my financial losses continue to increase because of my inability to earn as I had been able to previously.

(JPT I. at ¶ 4).

The consequences of the serious injuries Mr. Webster sustained in November of 2010 when struck by a car, giving rise to the Worker's Compensation Claim and the Uninsured

16

Motorist Claim, significantly exacerbated his already deteriorated physical and emotional condition and the financial stress on the family. (Trial Tr. Day 1, at p. 120; Trial Tr. Day 2, at p. 47) ("[Mr. Donahue]: You could probably feel the pain in your wrist and in your knee, right? [Mr. Webster]: I can honestly tell you I'm tears away from right now in how much pain I'm in.").

The UST acknowledges that the Websters received poor legal representation from Attorney Charos regarding the disclosure of the Pre-Petition Claims. (*See* Trial Tr. Day 2, at p. 66) ("Augustus Charos did a very bad job. . . . Mr. Charos should and hopefully will answer for his conduct."). *See also* Motion to Disgorge Fees filed by Assistant U.S. Trustee (Bankr. Doc. #98). In light of the facts before me and the relevant rulings of the First Circuit by which I am guided, this attempted defense of the Websters fails. The First Circuit in *In re Tully* articulated:

> Nor can an attorney's willingness to bear burden of reproach provide blanket immunity to a debtor; it is well settled that reliance upon advice of counsel is, in this context, no defense where it should have been evident to the debtor that the assets ought to be listed in the schedules.

*In re Tully*, 818 F.2d at 111; *see also In re Thunberg*, 413 B.R. 20, 26 (Bankr. D.R.I. 2009) (finding debtor's argument that "any 'mistakes' on his part were the result of innocent error, misstatements by, or bad advice by his counsel, *or that the Trustee didn't ask enough questions*" to be without merit) (emphasis added).[13] In this proceeding the same holds true for the § 341 meeting and the false and misleading statements made by the Websters while under oath.

---

[13] I am cognizant of the decision in *In re Marcella*, 2009 WL 3348251, which clarifies that "[w]hile casting a jaundiced eye toward 'my attorney did it!' the *Tully* case does not stand for the proposition that "reliance on an attorney's advice could never negate the element of fraudulent intent in an attack on a debtor's entitlement to a discharge." *Id.* at *16. *See also In re Mascolo*, 505 F.2d 274, 277 (1st Cir. 1974) (holding that acting on advice of counsel who is "fully aware of all the relevant facts" can rebut the inference of fraud. However, for the reasons delineated in this decision, I find that reliance upon the advice of counsel does not negate the element of fraudulent intent demonstrated by the Websters' reckless indifference to the truth with respect to Mr. Webster's injuries and his Pre-Petition Claims. *See also* distinguishing factors in *Marcella*, 2009 WL 3348251, at *16, prompting the court to

The Websters' proffered defense of 'acting on the advice of counsel" might have more merit if the Chapter 7 Trustee had stopped short in his inquiry regarding "claims." But such protestations serve as no protection for the Websters in the face of the continuing probing of Trustee Pisaturo, adroitly designed to elicit disclosure about pre-filing personal injury claims from the honest debtor. There can be no doubt, and I so find, that the Websters knew that their answers were false when they told the Chapter 7 Trustee that Mr. Webster did not have any injuries, was not involved in an automobile accident and had no settlements. Neither Mr. Webster nor Mrs. Webster explained to Trustee Pisaturo that such injuries and claims existed but their attorney advised them that the Pre-Petition Claims need not be listed on the schedules or disclosed. Nor did Mr. Webster reveal the $65,000 settlement offer received in connection with the Personal Injury Claim and his decision to reject this offer, or that a civil action had been commenced in the Providence County Superior Court after consultation with Attorney Boyer with whom, Mr. Webster admitted, he kept in regular contact about the lawsuit. It was all too convenient and served the Websters' purposes to avoid the truth at the § 341 meeting.

The Chapter 7 Trustee's questions regarding any injuries and any automobile accidents are not open to interpretation, and certainly did not require the assistance of counsel to answer truthfully. During the trial, Mr. Webster acknowledged that if his bankruptcy attorney had told him to state that he did not own a car, "If I knew I had a car, and he told me that I didn't have a car it would – I couldn't tell you if I'd lie or not. I don't think – I don't think I would. I don't

---

find that the debtors had not displayed fraudulent intent in their failure to report and turn over estate property after the petition date by relying on their attorney's advice that disclosure of a claim against Banknorth and the contact information of counsel handling the matter was sufficient, all details related to the claim were fully disclosed on the Statement of Financial Affairs, *and the Debtors testified truthfully and fully at the 341 meeting in response to the Trustee's questions*. This is not the scenario presented in the instant proceeding before me.

18

think I would lie." (Trial Tr. Day 1, at p. 123). The fact that the Pre-Petition Claims were intangible assets at the time of the § 341 meeting does not alter the obligation of the Websters to have disclosed their existence and to have answered the specific questions of Trustee Pisaturo honestly. "Debtors have an absolute duty to report whatever interests they hold in property, even if they believe their assets are worthless or are unavailable to the bankruptcy estate. . . . The bankruptcy court, not the debtor, decides what property is exempt from the bankruptcy estate." *In re Yonikus*, 996 F.2d 866, 904 (7th Cir. 1992).

Mr. Webster knew that his answers were untrue when made and he conceded such at the trial. When asked by Attorney Donahue if he had been truthful when he answered "no" to the Chapter 7 Trustee's question about any injuries, Mr. Webster responded, "No, I should have answered yes." (Trial Tr. Day 2, at p. 55). I find Mr. Webster's explanation, "[a]t that time I felt that it was a truthful answer, but now I know what I know. I would have to reflect to say no it wasn't a truthful answer," (Trial Tr. Day 1, at p. 119), disingenuous and not credible. The truth is the truth always.

Mrs. Webster fares no better. I find her statements that, "[t]o the best of my knowledge I told the truth," and "[w]hat I know now I know that it wasn't truthful, but I was advised by my attorney," equally unbelievable. (Trial Tr. Day 1, at pp. 154, 158). Mrs. Webster testified at the trial that she answered "no" to the question about injuries during the § 341 meeting because she was answering for herself. (Trial Tr. Day 1, at p. 53). Attorney Donahue successfully impeached this testimony as it differed from Mrs. Webster's testimony at her deposition conducted on behalf of the UST. (*See* Trial Tr. Day 1, at pp. 154-56). In her deposition, Mrs. Webster acknowledged "yes, the answer [to Mr. Pisaturo's question about injuries] was not truthful,

19

sorry." (Trial Tr. Day 1, at p. 154). Mrs. Webster made no effort to correct the false statements at the § 341 meeting regarding her husband's injuries, the auto accident, or the existence of the Pre-Petition Claims. When Attorney Donahue asked her at the trial whether the Chapter 7 Trustee's questions at the meeting were "unfair," including the questions as to whether either of them had sustained any injuries, she replied, "I guess not." (Trial Tr. Day 1, at p. 157).

In short, the cumulative evidence demonstrates that both Mr. and Mrs. Webster gave false and misleading answers to the Chapter 7 Trustee and acted with "reckless indifference to the truth." The UST has proven each element of § 727(a)(4)(A) and established that the Websters knowingly and fraudulently made false oaths relating to material facts, which if known prior to the entry of the Websters' discharge, would have resulted in denial of their discharge under § 727(a). Hence, the UST has met his burden and established that the Websters obtained their discharge through fraud, and their discharge must be revoked pursuant to § 727(d)(1).

### B.  Revocation of Discharge under Bankruptcy Code §727(d)(2)

As an alternative or additional basis, the UST has moved for revocation under § 727(d)(2). This Section provides that a debtor's discharge may be revoked if the movant shows that "the debtor acquired property that is property of the estate, or became entitled to property that would be property of the estate, and knowingly and fraudulently failed to report the acquisition of or entitlement to such property, or to deliver or surrender such property to the trustee." In its Treatise, Collier's explains that "[t]his provision imposes a duty upon the debtor to report to the trustee any acquisitions of property after the filing of the petition." 6 COLLIER ON BANKRUPTCY ¶ 727.17[4] (emphasis added). The court in *In re Gault* also offers a helpful discussion of the requirements of § 727(d)(2):

"[A]cquire" means gaining something new, not holding on to something already owned. When a debtor conceals pre-petition property to keep it out of the bankruptcy process, he does not necessarily gain or acquire anything new; he only avoids losing what he already had.

. . .

Interpreting § 727(d)(2) to include concealment of pre-petition property will make the limits on § 727(d)(1) practically meaningless. This problem leads the court to conclude that § 727(d)(2) was not intended to overlap § 727(d)(1) and should not overlap it when the wrong committed by the debtor was concealment of pre-petition property.

*In re Gault*, 2006 WL 2270338, at *3.

Courts ruling on § 727(d)(2) motions implicitly acknowledge the requirement that a debtor acquired or became entitled to property post-petition. In *In re Thunberg*, 413 B.R. 20, after the bankruptcy filing, the debtor received funds from his former wife in accordance with a property settlement agreement. The debtor concealed these assets from the Chapter 7 Trustee and expended the funds for his personal use. The court held that the Chapter 7 Trustee had satisfied the elements of § 727(d)(2). In *In re Marcella*, 2009 WL 3348251, at *14, the debtors obtained funds from a pension award post-petition which the debtors failed to report and turn over to the Chapter 7 Trustee. The court determined that the "Trustee has demonstrated that the Debtors acquired property of the estate *after* the Petition Date—namely, the Settlement Proceeds and, arguably, the Refinancing proceeds—and the first element [of § 727(d)(2)] has accordingly been established." *Id.* (emphasis added). The court in *In re Gault*, further noted that "§ 727(d)(2) may apply when the debtor receives proceeds or income from the concealed property after bankruptcy." 2006 WL 2270338, at *4.

The UST has not demonstrated that the Websters acquired, or became entitled to acquire, property of the estate during the bankruptcy case. Nor did they acquire the proceeds of the

21

Personal Injury Claim post-petition. This claim was pursued by the Chapter 7 Trustee and the

bankruptcy estate received the settlement funds ultimately paid on account of this claim. Without

this preliminary finding, the UST has failed to establish the grounds for revocation of the

Websters' discharge pursuant to § 727(d)(2).

## CONCLUSION

In light of my determination that the UST has met his burden of proof under § 727(d)(1),

a separate Order will enter revoking the discharge previously granted to the Websters.

Diane Finkle
United States Bankruptcy Judge

Issued: January 14, 2013

22